## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOAN COLLINS,<br><br>               Plaintiff,<br><br>  v.<br><br>CVS PHARMACY, INC. and VELOCITY PHARMA, LLC,<br><br>               Defendants. | Case No.:<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joan Collins, by her attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on her personal knowledge:

### NATURE OF THE ACTION

1. This action seeks damages for physical injuries caused by contaminated CVS Health Multi-Action Relief Drops ("Eye Drops") that were distributed by Defendant Velocity Pharma, LLC ("Velocity") and sold by Defendant CVS Pharmacy, Inc. ("CVS") (collectively, "Defendants").

2. Defendants distributed and sold Eye Drops that were contaminated with various bacteria, including *Pseudomonas*, a potentially deadly antibiotic-resistant bacteria. The Eye Drops' bacterial contamination originated at the Maharashtra, India manufacturing facility of Defendants' Eye Drop manufacturer, the India-based Kilitch Healthcare India Limited ("Kilitch").

3. In October 2023, an inspection by the United States Food and Drug Administration ("FDA") revealed egregious quality oversight issues, unsanitary conditions, and positive bacterial test results from environmental sampling of critical drug production areas of the Maharashtra facility.

1

4.      On October 27, 2023, the FDA warned consumers not to purchase or use twenty-six over the counter Kilitch-manufactured eye drops from several major brands due to the risk of eye infection, including the Eye Drops distributed by Velocity and sold by CVS.

5.      On November 15, 2023, Kilitch recalled the eye drops identified in the October 2023 FDA warning with expiration dates ranging from November 2023 to September 2025, silently acknowledging that Kilitch's quality control lapses had been going on for at least two years based on the general shelf-life of eye drops.

6.      Thus, from late 2021 to late 2023, Velocity distributed contaminated Kilitch-manufactured Eye Drops to CVS, and CVS sold the Eye Drops as part of the CVS Health Brand Eye Products portfolio. During that time, Defendants also directly contributed to the contamination originating at the Kilitch manufacturing facility by, among other things, improperly transporting and storing the Eye Drops as well as failing to conduct inspections and supplier/manufacturer audits.

7.      From late 2021 to late 2023, despite their actual or constructive knowledge of the bacterial contamination or unreasonable risk of bacterial contamination, Defendants continued to sell contaminated Eye Drops and failed to disclose or warn that the Eye Drops posed a substantial risk of harm due to bacterial contamination or the unreasonable risk of bacterial contamination, including contamination by *Pseudomonas* bacteria.

8.      On or about November 13, 2023, Plaintiff (age 78) purchased contaminated Eye Drops that Kilitch later and untimely recalled, and that CVS later and untimely removed from its store shelves. Plaintiff reviewed the Eye Drops labeling and instructions and relied on Defendants' representations that the Eye Drops were sterile as well as Defendants' omissions regarding the Eye Drops' bacterial contamination.

9.      Starting on or shortly after November 13, 2023, Plaintiffs suffered substantial injuries after purchasing and using the contaminated and defective Eye Drops, including a severe eye infection. From November 16 to November 23, 2023, Plaintiff was treated at NYU Langone Hospital for periorbital cellulitis (a type of acute eye infection) and was treated with powerful IV antibiotics and other medications for eight days. Plaintiff continues to experience adverse effects to her eyes and vision caused by the infection.

10.     Based on foregoing misconduct, Plaintiff brings claims against Defendants for Strict Liability-Design Defect (First Claim); Strict Liability-Manufacturing Defect (Second Claim); Strict Liability-Failure to Warn (Third Claim); Negligence (Fourth Claim); and Breach of the Implied Warranty of Merchantability (Fifth Claim).

## PARTIES

11.     Plaintiff is, and was at all relevant times, a resident and citizen of Nassau County, New York.

12.     Defendant CVS is, and was at all relevant times, a corporation organized under the laws of Rhode Island with its principal place of business in Woonsocket, Rhode Island.

13.     Defendant Velocity is a limited liability company organized under the laws of the State of New York with its principal place of business in Farmingdale, New York. Velocity's members are Ankur Shah; Hemlata Patel; Hasmukh Patel; Monil Patel; Swift Pharma, LLC; Trinity Worldwide, Inc.; and Valley Consulting and Financial, LLC. Upon information and belief:

a.      All of Velocity's individual members are citizens and residents of the state of New Jersey.

b.      Swift Pharma, LLC is a limited liability company organized and existing under the laws of the state of New Jersey, with principal offices in Monmouth Junction, New Jersey. Its members are Haresh Sheth, Darshan Sheth, Deepit Ananad and Rajiv Chanani, each of whom is a citizen and resident of the state of New Jersey.

3

c.    Trinity Worldwide, LLC is a limited liability company organized under the laws of the state of Delaware, with principal offices located in Plainfield, New Jersey. Its members are Darshan Sheth and Dhaval Sheth, each of whom is a citizen and resident of the state of New Jersey.

d.    Valley Consulting and Financial, LLC is a limited liability company organized under the laws of the state of Florida, with principal offices in Monmouth Junction, New Jersey. Its members are Haresh Sheth and Rupa Sheth, each of whom is a citizen and resident of the state of New Jersey.

## JURISDICTION AND VENUE

14.    This Court has original jurisdiction over Plaintiff's claims under 28 U.S.C. 1332(a). Complete diversity exists between Plaintiff and Defendants: Plaintiff is a citizen of New York; CVS is a citizen of Rhode Island; and Velocity, by virtue of the citizenship of its LLC members, is a citizen of New Jersey. Moreover, the amount in controversy in this case exceeds $75,000, exclusive of interest and costs.

15.    This Court has personal jurisdiction over Defendants. Defendants transact business in New York and Plaintiff's claims arise from those business transactions. Moreover, Velocity has its principal place of business in New York, and Defendants are engaged in systematic and continuous business activity in New York, have sufficient minimum contacts in New York, or otherwise intentionally avail themselves of the New York consumer market. As a result, exercising personal jurisdiction over Defendants satisfies due process requirements based on Defendants' business in, and substantial contacts with, New York.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391. Plaintiff resides in this District, and a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in this District, including Plaintiff's Eye Drops purchase and her injuries.

4

## FACTUAL BACKGROUND

**A.      Defendants, the Eye Drops, and the Eye Drop Representations and Omissions**

17.      Velocity is a pharmaceutical manufacturer and distributor founded in 2009. In its LinkedIn profile, Velocity states:

> We cater to the private label requirements of the top retail chains of the world like CVS Pharmacy, Cardinal Health, Rite Aid Pharmacy, Target etc.* Our product basket mainly focuses on Sterile Ophthalmic and Injectable products. With a combined retail experience of over 150 years, our management is working on expanding our presence in US, Europe, Asia. Our constant endeavour is to provide utmost satisfaction to our customers and vendors through superior quality products developed using advanced innovative technology.

18.      On its official website, Velocity emphasizes three "working principles," including:

- 1) Humane Approach for Product Development

  We are a company that is advancing in the field of pharmaceutical product development by taking into consideration the patient and environment. We specialize in developing a product that does not contain a harmful preservative or harmful ingredients.

- 2) Strong Partnership for Sustainable Growth

  Our strategic partnership across the world with various CMOs [contract manufacturing organization] gives us access to all types of manufacturing capabilities. The partnership with multiple CMOs helps us in the on-time launch and delivery of the product.

19.      One of Velocity's key strategic partnerships with various CMOs includes its relationship with Kilitch. The eye drops cited by the FDA in its October 2023 warning were manufactured by Kilitch; supplied by Kilitch to Velocity; and ultimately distributed by Velocity to U.S. wholesalers and retailers, including the distribution to CVS of the CVS Health-brand Eye Drops purchased by Plaintiff in November 2023 and at issue in this case.

20.      CVS is the largest pharmacy chain in the United States by number of locations and

5

by prescription revenue. CVS's ultimate parent company, CVS Health Corp., ranked as the fifth largest United States corporation by revenue in the 2020 Fortune 500 list.

21.    In its Health Code of Conduct, CVS states:

> CVS Health is committed to providing safe and high-quality products and services to our patients, customers, and clients.
>
> ***
>
> CVS Health sources products from suppliers that meet our high standards for safety and quality, and who comply with the principles set forth in our CVS Health Supplier Ethical Standards. **We have a quality assurance program that ensures that all CVS Health store brand products are safe and efficacious, as well as comply with regulatory requirements and internal policies. This program includes the routine testing of store brand products, as well as the auditing of our suppliers**. We have systems in place to receive, react, and respond to customer feedback regarding our products and to ensure that recalls are addressed immediately.

(emphasis supplied).

22.    CVS sells prescription drugs and a wide assortment of general merchandise, including over-the-counter drugs branded under the CVS Health umbrella and the CVS Health Brand Eye Drops purchased by Plaintiff and at issue here.

23.    When Plaintiff purchased the Eye Drops in November 2023, CVS uniformly represented on packaging that the Eye Drops "relieved irritation," "relieved redness," and "moisturized." Critically, CVS represented on all labeling that the Eye Drops were "sterile." CVS made those representations even though, as demonstrated by the October 2023 FDA warning and the November 2023 Kilitch recall, the Eye Drops could not be used for any purpose, were not sterile, and posed life-threatening risks.

24.    However, when Plaintiff purchased the Eye Drops, Defendants failed to disclose or warn on the Eye Drops packaging, labeling (including in the ingredients section), or otherwise that

6

the Eye Drops were contaminated with bacteria, including *Pseudomonas*; were at unreasonable risk of contamination, including *Pseudomonas*; and/or the signs and what do if a user suspected a bacterial infection.

**B.    From Late 2021 to Late 2023, The Eye Drops Were Contaminated with Bacteria or At Unreasonable Risk of Bacterial Contamination Due to Design and/or Manufacturing Defects**

25.    Defendants possessed proprietary knowledge regarding the ingredients, the source of ingredients, and raw materials (as well as the sources and integrity of the ingredients and raw materials) used in manufacturing the Eye Drops; the manufacturers and manufacturing processes for the Eye Drops; the manufacturer and manufacturing process for the ingredients and raw materials in the Eye Drops; and the risks associated with those processes, such as the risk of bacterial contamination, including *Pseudomonas* contamination.

26.    Defendants—as sophisticated and prominent companies involved in selling over-the-counter drugs—are aware or should be aware of potential risks to their over-the-counter drugs (including the Eye Drops) and to the ultimate users of their over-the-counter drugs. Furthermore, Defendants claim to specialize in providing over-the-counter drugs that do not contain harmful ingredients and to have internal processes and codes of conduct in place to prevent the sale of unsafe products to consumers and to comply with applicable law and regulations.

27.    Plaintiff did not and could not know of latent dangers arising from the Eye Drops' designs, formulation, or manufacturing processes, including the risk that the Eye Drops were contaminated or at unreasonable risk of contamination, including *Psuedomonas* contamination. Moreover, Plaintiff could not reasonably discover the contamination or unreasonable risk of contamination through inspection or otherwise.

28.    Despite Defendants' duty and ability to discover latent risks impacting the Eye

7

Drops in their distribution chain, since late 2021, the Eye Drops suffered from a manufacturing and/or design defect originating at Kilitch's Indian manufacturing facility that resulted in bacterial contamination and/or exposed the Eye Drops to the unreasonable risk of bacterial contamination. On November 15, 2023, Kilitch recalled all CVS Eye Drops with expiration dates ranging from November 2023 to September 2025. Given that the Eye Drops generally have a two-year shelf-life, Kilitch's recall—which impacts CVS Eye Drops with expiration dates beginning on November 2023—is an admission that CVS Eye Drops have been defective, unreasonably dangerous, and unfit for sale since at least November 2021.

29. Defendants had a duty to distribute and/or sell Eye Drops that were designed to prevent the readily foreseeable risk of bacterial contamination (including *Pseudomonas* contamination), particularly due to the heightened risk of harm to users because eye drops, when applied to the eyes, bypass some of the body's natural defenses.

30. Despite that duty, from at least late 2021 to November 2023, Defendants distributed and/or sold Eye Drops that were unreasonably dangerous and unfit for sale based on a design defect: the bacterial contamination of the Eye Drops as well as the lack of preservatives or antimicrobial or biocidal agents that would prevent bacterial contamination and extend shelf-life, used either during the Eye Drops' manufacturing processes or used in finished Eye Drops. The design defect made the Products unreasonably susceptible to bacterial contamination (including contamination by *Pseudomonas*) and created a substantial likelihood of harm due to the unreasonable risk that the Eye Drops could cause an eye infection, particularly where products applied to the eye bypass some of the body's immune defenses.

31. The Eye Drops' defective design and bacterial contamination could have been reduced or avoided entirely by adopting a reasonable alternative design, including adding a preservative or antimicrobial or biocidal agent during the manufacturing process or in finished

8

products. Preservatives and agents are commonly included in eye drops generally to prevent microbial contamination and extend the shelf-life. To the extent the Eye Drops already included preservatives or antimicrobial or biocidal agents, the unreasonable risk of bacterial contamination stemming from the Eye Drops' defective design could have been reduced or avoided entirely by changing the preservative or increasing the amount of preservative or antimicrobial or biocidal agents during the manufacturing process or in finished Eye Drops, or by including proper antimicrobial or biocidal treatments for the Eye Drops components and raw or finished materials.

32.    Defendants also had a duty to distribute and/or sell Eye Drops that were manufactured to prevent the readily foreseeable risk of bacterial contamination (including *Pseudomonas* contamination), particularly due to the heightened risk of harm to users because products applied to the eyes bypass some of the body's immune defenses.

33.    Defendants were thus required to implement rigorous quality control and audit measures that have long been understood to prevent bacterial contamination during the manufacturing processes and/or to quickly root out bacterial contamination existing in the distribution chain, including:

   a.  Microbial risk assessment of raw materials and finished ingredients;

   b.  Developing effective audit checklists for suppliers/distributors/and sellers focused on microbial control;

   c.  In-person audits of production;

   d.  Supplier quality agreements established with a focus on microbial control;

   e.  Control of storage conditions in warehouses, during transit, and post-production;

   f.  Effective maintenance and hygiene of facilities and equipment;

   g.  Effective cleaning of equipment and facilities;

   h.  Minimizing contact with humans and controlling vermin and insects;

       i.    Controlling containers used to store and ship materials;

       j.    Controlling the supply chain, water systems, and wastewater and waste;

      k.   Developing pasteurization or sterilization processes for natural ingredients and raw materials;

       l.    Developing microbial test methods and specifications based on risk assessments; and/or

     m.  Effectively investigating microbial contamination.

34.     Despite their duties regarding the manufacturing processes underlying the Eye Drops in their distribution chain, Defendants distributed and/or sold Eye Drops suffering from a manufacturing defect originating at Kilitch's manufacturing facility for at least two years (late 2021 to late 2023).

35.     As detailed by the FDA's October 2023 inspection report of the Kilitch facility, the Eye Drops' manufacturing process suffered from innumerable and egregious manufacturing and/or quality control lapses causing bacterial contamination and/or exposing the Eye Drops to the unreasonable risk of bacterial contamination, including (among many others):

      a.   Procedures designed to prevent microbial contamination of drug products purporting to be sterile were not established, written or followed;

      b.   Operators performed tasks in sterile areas and non-sterile areas without personal protective equipment designed to prevent microbial contamination, without donning and doffing PPE as required to prevent microbial contamination (including working barefoot), and repeatedly making impermissible bodily contact with sterile components and ingredients;

      c.   Operators used non-sterile bottles and other non-sterile components in the aseptic filling process and engaged in practices increasing the risk of microbial contamination, including using non-sterile cloths to clean sterile areas and exposing sterile components to contamination in non-sterile areas (including removing PPE and brushing hair in sterile areas);

      d.   Brown residue collected on part of the HEPA (high efficiency particulate air) filtration system, a key component of the sterile manufacturing process;

e.  The laboratory records did not include complete data derived from all tests, examinations and assays necessary to assure compliance with established specifications and standards;

f.  Microbiologists that were responsible for collecting environmental monitoring samples and personnel monitoring samples did not collect all required samples but nevertheless falsely reported that uncollected samples fell below alert levels, a practice that was going on for at least one year as of October 2023. As just one of many examples, from October 6-11, 2023, the aseptic entry and exit log from the aseptic fill room documented that there should have been 102 sets of sample plates under incubation yet only 3 plates were present;

g.  A microbiologist confirmed that when samples were collected, if they were over an alert or action level, they are verbally reported to the microbiology manager, who then requested additional cleaning without additional documentation of the alert or action condition. Instead, a microbiologist documented a result below the alert limit, a practice on-site microbiologists reported had occurred between 2-3 times per month;

h.  From roughly 2018-2023, despite astounding manufacturing and quality control flaws, the microbiology laboratory reported no action level results and only four alert level results. However, Samples taken by the FDA between only October 16-18, 2023, included 39 action or alert level "excursions," including 15 Grade A action level results, 5 grade B action level results, 1 Grade B alert level, 13 personnel monitoring action level results, and 5 personnel monitoring alert level results;

i.  Procedures designed to prevent microbial contamination of drug products purporting to be sterile did not include adequate validation of the aseptic process, such as smoke studies to determine the existence of proper air flow in aseptic areas;

j.  Laboratory controls did not include establishing scientifically sound and appropriate specifications and test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality, and purity.

k.  Aseptic processing areas were deficient regarding the system for cleaning and disinfecting the room and equipment to produce aseptic conditions, including the use of contaminated mops; and

l.  Buildings used in the manufacture, processing, packing, and holding of drug products were not maintained in a clean and sanitary condition.

36.  Velocity and CVS were not simply unwitting distributors and sellers of Kilitch-manufactured Eye Drops that were contaminated or at risk of contamination since at least 2021.

11

Instead, during that time, Velocity and CVS directly contributed to manufacturing and quality control deficiencies by, among other things, failing to properly inspect, store, test, and audit Kilitch-manufactured Eye Drops, substantially increasing the risk of contamination, as well as the probability that contaminated Eye Drops would be sold to consumers, including Plaintiff.

37.    Moreover, Velocity and CVS either conducted on-site inspections of the Kilitch facility and knew of and ignored the Eye Drops' design defects and/or the egregious manufacturing and quality-control deficiencies at the Kilitch facility, and/or Velocity and CVS failed to conduct on-site inspections of the Kilitch manufacturing facility when they knew or should have known that Kilitch's manufacturing and quality control processes were grossly deficient and would lead to Eye Drops contamination and/or an unreasonable risk of Eye Drops contamination (detailed below).

38.    Thus, from at least late 2021 until November 2023, Defendants acted intentionally, recklessly, or with gross negligence (to the point of disregarding substantial risk to human safety and life) in failing to prevent the distribution and/or sale of Eye Drops that were contaminated or at unreasonable risk of contamination and by directly contributing to the distribution and/or sale of Eye Drops that were contaminated or at risk of contamination.

**C.    From Late 2021 to November 2023, Defendants Knew or Should Have Known of the Eye Drops Contamination and/or Unreasonable Risk of Contamination and Had a Duty to Warn Consumers and Plaintiff of Those Risks**

39.    From at least late 2021 to November 2023, and well before Plaintiff's November 13, 2023 Eye Drops purchase, Defendants had a duty to warn consumers, including Plaintiff, of the risk that the Eye Drops were contaminated with bacteria, including *Pseudomonas*; the systemic risks in Eye Drop design or manufacturing which made the Eye Drops unreasonably susceptible to bacterial contamination; and/or the signs and what do if a user suspected a bacterial infection.

40.     From at least late 2021, and well before Plaintiff's Eye Drops purchase, Defendants knew or should have known of the substantial risk that the Eye Drops were contaminated with bacteria and/or regarding the systemic and catastrophic flaws in the Eye Drops' design or manufacturing that made the Eye Drops unreasonably susceptible to bacterial contamination.

41.     During that time, Defendants knew that Plaintiff and other consumers were purchasing and using the Eye Drops based on the belief that the Eye Drops were sterile, did not contain bacteria, and/or were not at an unreasonable risk of bacterial contamination, based on Defendants' representations and the Eye Drops labeling and packaging and other promotional materials stating the Eye Drops were sterile.

42.     During that time, Defendants knew or should have known that the Eye Drops were contaminated with *Pseudomonas* and other bacteria or were unreasonably susceptible to bacterial contamination based on reasonable and necessary quality control measures, including Eye Drops testing and auditing, that would have revealed the contamination or unreasonable risk of contamination in late 2021 and well before Plaintiff's November 2023 Eye Drops purchase.

43.     Between late 2021 and November 2023, Defendants knew or should have known of the Eye Drops' bacterial contamination and/or the unreasonable risk of bacterial contamination based on onsite inspections of the Kilitch manufacturing facility. During that time, Defendants conducted or should have conducted onsite inspections of the Kilitch manufacturing facility that either revealed or would have revealed bacterial contamination or the unreasonable risk of bacterial contamination due to plainly apparent design and manufacturing defects at the Kilitch facility.

44.     Between late 2021 and November 2023, Defendants knew or should have known that the Eye Drops were contaminated or at unreasonable risk of contamination, as well as the need for onsite inspections of the Kilitch-facility because (among other things):

   a.  India's generic and prescription drug manufacturing industry is notorious for manufacturing and quality control lapses. Among many incidents in the last

13

decade, in 2023, manufacturing lapses at an Intas Manufacturing plant in Western India led to a critical shortage of life saving cancer medicines; in 2022, the deaths of 60 Gambian children was linked to toxic medicinal syrups manufactured by Maiden Pharmaceutical Ltd., located in Haryana, India; and in 2021, Indian drug manufacturer Fresenius Kabi Oncology Limited was sentenced to $50 million in fines and forfeitures after pleading guilty to concealing and destroying records prior to a 2013 FDA plant inspection;

b. The regulatory threshold for listing and selling over-the-counter drugs, including the Eye Drops, is minimal, requiring sellers of over-the-counter drugs to enter limited information into the FDA's automated system, including the name of the medicine, the dosage, and an image of the label;

c. The FDA lacks the resources to conduct inspections of manufacturing facilities of prescription and over-the-counter drugs, inspecting only 52% of registered manufacturing facilities for over-the-counter drugs since 2015, only 6% of overseas facilities, and only 3% of Indian facilities specifically; and

d. The FDA's lack of resources to inspect manufacturing facilities, particularly overseas facilities, was greatly exacerbated by the COVID-19 pandemic.

45.    Moreover, in February 2023, a time well before Plaintiff's November 2023 Eye Drops purchase, Defendants knew or should have known of the risk that the Eye Drops were contaminated or at unreasonable risk of contamination based on uncannily similar manufacturing lapses at, and a bacterial contamination of eye drops manufactured by, another Indian manufacturer, Globa Pharma, Ltd ("Globa").

46.    In early 2023, the United States Centers for Disease Control and Prevention identified more than 55 individuals in 12 states who had been diagnosed with severe infections caused by a rare form of *Psuedomonas*, ultimately tracing the strain to eye drops manufactured by Globa in India; distributed by two American-based distributors (Ezricare LLC and Delsam Pharma LLC); and sold in major retailers throughout the United States. The *Pseudomonas* infections led to 4 deaths, 18 cases of vision loss (including four cases of eyeball removal), and scores of other infections.

14

47.     In February 2023, the FDA inspected Globa's Chennai, India factory and discovered conditions strikingly like the conditions at Kilitch's Maharashtra, India manufacturing facility. As with the Kilitch facility, the FDA discovered brown residue in the filling machines, untrained workers wearing dirty, reused boots, and bacterial contamination in unopened bottles of eye drops. Like this case, in early February 2023, the FDA blocked the import of Globa eye drops, warned consumers not to use Globa Eye Drops, and recommended that Globa recall the impacted eye drops (something Globa did in late February 2023).

48.     To the extent Defendants feign ignorance of the design and/or manufacturing lapses at the Kilitch facility existing since late 2021, they cannot reasonably claim ignorance as of February 2023 based on the Globa recall. Defendants either distributed and/or sold recalled Globa eye drops and/or were aware of the February 2023 Globa contamination and recall based on their prominent position in the over-the-counter consumer healthcare market. However, instead of taking immediate action to ensure the safety of the Eye Drops at issue here (manufactured in India), Defendants continued to sell the Eye Drops, representing them as "sterile" in the process.

49.     Given their knowledge of the foregoing circumstances, between late 2021 and late 2023, Defendants either knew of the substantial issues existing in the Kilitch manufacturing facility or willfully ignored the substantial issues existing in the Kilitch manufacturing facility. As a result, Defendants had a duty to warn Plaintiff of the bacterial contamination; the potential for bacterial contamination; and the signs and symptoms of a bacterial infection.

**D.     In October and November 2023, the FDA Issued a Warning That the Eye Drops Could Cause Eye Infections and Kilitch Issued a Recall of Eye Drops with Expiration Dates from November 2023 to September 2025**

50.     On October 27, 2023, the FDA warned consumers not to purchase or use twenty-six over the counter Kilitch-manufactured eye drops from several major brands due to the risk of eye infection, including the Eye Drops distributed by Velocity and sold by CVS.

51.    When issuing its warning, the FDA stated agency investigators found unsanitary conditions in the Kilitch manufacturing facility as well as positive bacterial test results from environmental sampling of critical drug production areas in the Kilitch facility. The FDA also stated "[o]pthalmic drug products posed a potential heightened risk of harm to users because drugs applied to the eyes bypass some of the body's natural defenses."

52.    Although the FDA did not have the practical ability to implement a recall of the impacted eye drops already available to United States consumers, the FDA blocked the import of Kilitch-manufactured eye drops and recommended that Kilitch recall all lots of available eye drops.

53.    On November 15, 2023, as recommended by the FDA, Kilitch recalled the eye drops identified by the FDA in its October 2023 warning with expiration dates ranging from November 2023 to September 2025. When doing so, Kilitch stated that there was a "potential risk of eye infections and related harm" and, like the FDA, noted that "[o]pthalmic drug products posed a potential heightened risk of harm to users because drugs applied to the eyes bypass some of the body's natural defenses."

54.    Despite the FDA's October 27, 2023 warning, Defendants did not disclose to or warn consumers that the Eye Drops were contaminated or at unreasonable risk of contamination and some Kilitch-manufactured Eye Drops remained on CVS store shelves at least until November 13, 2023, when Plaintiff purchased the Eye Drops at issue here.

**E.    On November 13, 2023, Plaintiff Purchased Contaminated CVS Health Eye Drops and Suffered Severe Eye Injuries Caused by the Contaminated Eye Drops**

55.    Prior to November 13, 2023, Plaintiff was not using any other eye drops or other eye-related product that could cause an eye infection, and there can be no other cause for her eye-related injuries except the Eye Drops.

16

56.    On or about November 13, 2023, Plaintiff purchased contaminated CVS Health Eye Drops that were listed in the FDA warning on October 27, 2023; that Kilitch later and untimely recalled due to the substantial likelihood of harm and unreasonable risk of bacterial contamination on November 15, 2023; and that CVS later and untimely removed from its store shelve.

57.    When Plaintiff purchased and used the Eye Drops, she reviewed the Eye Drops labeling and instructions and relied on Defendants' representations about the Eye Drops, including representations that the Eye Drops could be used to relieve irritation and redness and that the Eye Drops were sterile. Plaintiff also relied on CVS's omissions regarding the likelihood of substantial harm stemming from the Eye Drops' bacterial contamination.

58.    Starting on or about November 13, 2023, Plaintiffs suffered substantial physical injuries after purchasing and using the contaminated and defective Eye Drops. By November 15, 2023, Plaintiff was suffering a severe eye infection, including redness and swelling around the eyes, vision issues (including severe double vision and severe light sensitivity), substantial eye pain, itching, and headaches.

59.    On November 15, 2023, Plaintiff sought treatment for her eye infection from an ophthalmologist who informed her that she had a severe infection and prescribed a CAT scan. On November 15, 2021, Plaintiff's ophthalmologist also examined the CVS Eye Drops and determined that they were on the FDA's recall list (which was twice posted in his office).

60.    On November 16, 2023, Plaintiff sought emergency medical care at NYU Langone Hospital, where she was diagnosed with periorbital cellulitis and administered IV antibiotics in the nurses' station overnight until she could be admitted into the hospital.

61.    On November 17, 2023, Plaintiff was admitted to NYU Langone Hospital and administered IV antibiotics and other medications for an additional seven (7) days to treat her eye infection. During those seven days, Plaintiff could not see, had severe light sensitivity, and

17

essentially blind and sitting in the dark. Plaintiff also suffered side effects from the antibiotics and other medications used to treat her infection, including severe stomach issues.

62.    During her admission at NYU Langone Hospital, Plaintiff's treating infectious disease internist told Plaintiff that she had an eye infection caused by *Psuedomonas* and another bacterium. Plaintiff's treating infectious disease internist also concluded that the contaminated CVS Health Eye Drops caused Plaintiff's eye infection.

63.    On November 23, 2023 (Thanksgiving), Plaintiff was discharged from NYU Langone. Even so, Plaintiff continues to experience adverse effects caused by her eye infection, including eyesight deterioration and severe sensitivity to light.

64.    As a result of Defendants' misconduct and the Product defect(s), Plaintiff suffered the following injuries (among others): an eye infection; periorbital cellulitis; generalized trauma, injury, and damage; double vision; temporary blindness; severe light sensitivity; reduced vision; nervousness, emotional tension, anxiety; potentially permanent vision impairment and light sensitivity.

65.    As a direct and proximate result of her injuries, Plaintiff suffered various damages, including (but not limited to): medical expenses, past and future; loss of earnings and lost earning capacity, past and future pain and suffering; past and future embarrassment and humiliation, and past and future loss of enjoyment of life's pleasures.

66.    Defendants' misconduct and the Product defect(s) were a substantial cause in causing Plaintiff's injuries and resulting damages.

## FIRST CLAIM FOR RELIEF
## STRICT PRODUCTS LIABILITY: DESIGN DEFECT

67.    Plaintiff realleges and incorporates by reference the allegations elsewhere in the Complaint as if set forth fully herein.

18

68.    Velocity and CVS are distributors and sellers of the Eye Drops, respectively.

69.    A manufacturer, distributor, or seller may be held strictly liable for a design defect when, at the time the product leaves the manufacturer's/distributor's/seller's hands, the product is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce.

70.    Here, the Eye Drops as designed posed a substantial likelihood of eye-related injuries due to bacterial contamination due to a lack of preservatives or antimicrobial or biocidal agents or improper/inadequate preservatives or biocidal agents.

71.    The Eye Drop's defective design and bacterial contamination could have been reduced or avoided entirely by adopting a reasonable alternative design, including adding a preservative or antimicrobial or biocidal agent during the manufacturing process or in finished products. Preservatives and agents are commonly included in eye drops to prevent microbial contamination and extend the shelf-life. To the extent the Eye Drops already included preservatives or antimicrobial or biocidal agents, the unreasonable risk of bacterial contamination stemming from the Eye Drops' defective design could have been reduced or avoided entirely by changing the preservative or increasing the amount of preservative or antimicrobial or biocidal agents during the manufacturing process or in finished Eye Drops, or by including proper antimicrobial or biocidal treatments for the Eye Drops components and raw or finished materials.

72.    The Eye Drops' defective design was a substantial factor in causing Plaintiff's injuries and resulting damages. Further, Defendants' actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

19

## SECOND CLAIM FOR RELIEF
### STRICT PRODUCTS LIABILITY: MANUFACTURING DEFECT

73.    Plaintiff realleges and incorporates by reference the allegations elsewhere in the Complaint as if set forth fully herein.

74.    Velocity and CVS are distributors and sellers of the Eye Drops, respectively.

75.    A manufacturer, distributor, or seller may be held strictly liable for a manufacturing defect when, at the time the product leaves the manufacturer's/distributor's/seller's hands, a specific product unit was defective as a result of some mishap in the manufacturing process, improper workmanship, or because defective materials were used in its construction, thereby causing Plaintiff's injury.

76.    Here, as detailed above, a manufacturing flaw existed in the Eye Drops because it deviated in quality and other performance standards from other identical products through, *inter alia*, faulty workmanship and/or contaminated raw materials or other ingredients and components creating a substantial likelihood of injury, including eye infections, due to bacterial contamination.

77.    At this early stage, Plaintiff cannot be sure of the precise design or manufacturing defect that led to Plaintiff's injuries because the Eye Drops' design and manufacturing process is uniquely within the knowledge and control of Defendants as distributors and sellers. However, under no circumstances should the Eye Drops have caused an eye infection, and it is certain that the Eye Drops suffered from a manufacturing and or design defect because the Eye Drops did, in fact, cause Plaintiff's eye-related injuries and Plaintiff's eye-related injuries cannot be attributed to any other cause but a manufacturing or design defect in the Eye Drops.

78.    The Eye Drops' manufacturing defect was a substantial factor in causing Plaintiff's injuries and resulting damages. Further, Defendants' actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

20

**THIRD CLAIM FOR RELIEF**
**STRICT PRODUCTS LIABILITY:**
**FAILURE TO PROVIDE ADEQUATE WARNING**

79.     Plaintiff realleges and incorporates by reference the allegations elsewhere in the Complaint as if set forth fully herein.

80.     Velocity and CVS are distributors and sellers of the Eye Drops, respectively.

81.     A manufacturer, distributor, or seller may be held strictly liable when, at the time the product leaves the manufacturer's/distributor's/seller's hands, the manufacturer/distributor/seller failed to provide adequate warnings regarding the risks and dangers associated with the use, or foreseeable misuse, of its product.

82.     Here, Defendants failed to warn or disclose to Plaintiff the substantial eye-related health risks posed by the Eye Drops due to bacterial contamination or the unreasonable risk of bacterial contamination despite a duty to do so.

83.     As detailed above, Defendants knew or should have known of the Eye Drops' bacterial contamination or the unreasonable risk of contamination long before Plaintiff's November 13, 2023 purchase based on: (1) India's designation as a geography of concern due to widespread lax manufacturing and quality control issues relating to prescription and over-the-counter drugs; (2) the minimal oversight by the FDA regarding the sale of over-the-counter drugs, including the FDA's limited ability to conduct onsite inspection of over-the-counter drug manufacturing facilities (most notably FDA's inspection of only 3% of total Indian manufacturing facilities since 2015); (3) the February 2023 Globa Pharma eye drops contamination (and resulting infections), FDA warning, and eventual recall; and (4) the October 27, 2023, FDA warning regarding Kilitch-manufactured eye drops, including the Eye Drops at issue here .

84.     The Eye Drops distributed and/or sold by Defendants were defective due to

21

inadequate warnings or instructions because Defendants failed to adequately warn consumers about: (1) the bacterial contamination; (2) the conditions existing at the Kilitch manufacturing facility creating an unreasonable risk of bacterial contamination; and/or (3) what do if a user suspected an eye infection, including to immediately consult a medical professional.

85.     Plaintiff reviewed the Eye Drop packaging, labeling, and instructions and used the Eye Drops as directed without any knowledge of the health risks of the Eye Drops because Defendants did not include any warnings or instructions regarding those risks. Plaintiff would not have purchased or used the Eye Drops (or would have recognized eye-infection symptoms sooner) had Defendants included proper warnings and instructions on the health risks of the Eye Drops.

86.     Defendants' failure to warn or properly instruct on the Eye Drops' health risks was a substantial factor in causing Plaintiff's injuries and resulting damages. Plaintiff reviewed the Eye Drops packaging and labeling and would have heeded warnings regarding the Eye Drops' health risks and not purchased the Eye Drops and/or used the Eye Drops while she was experiencing adverse injuries. Further, Defendants' actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

## FOURTH CLAIM FOR RELIEF
### NEGLIGENCE

87.     Plaintiff realleges and incorporates by reference the allegations elsewhere in the Complaint as if set forth fully herein.

88.     Velocity and CVS are distributors and sellers of the Eye Drops, respectively.

89.     Defendants had a duty to exercise reasonable care in designing, manufacturing, testing, marketing, and distributing the Eye Drops into the stream of commerce, including a duty to ensure that the Eye Drops did not pose a significantly increased risk of injury to Plaintiff and other consumers and to warn consumers of known and knowable risks regarding the Eye Drops.

22

90.     Defendants breached those duties and failed to exercise reasonable care in designing, manufacturing, testing, marketing and distributing the Eye Drops due to the unreasonable and foreseeable risk that the Eye Drops could cause injuries due to bacterial contamination. Defendants also breached their duty to warn by failing to disclose the known or knowable risk of injuries to Plaintiff.

91.     Defendants' negligence was a substantial factor in causing Plaintiff's injuries and resulting damages. Further, Defendants' actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

**FIFTH CLAIM FOR RELIEF**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

92.     Plaintiff realleges and incorporates by reference the allegations elsewhere in the Complaint as if set forth fully herein.

93.     Velocity and CVS are distributors and sellers of the Eye Drops, respectively.

94.     Defendants, as the manufacturers, marketers, distributors, and/or sellers of the Eye Drops, impliedly warranted, among other things, that the Eye Drops were merchantable, in that: (a) the Eye Drops would pass without objection in the trade under the contract description; (b) the Eye Drops were of fair average quality within the description; (c) the Eye Drops were fit for the ordinary purposes for which such goods are used; and (d) the Eye Drops conformed to the promises or affirmations of fact made on the containers or labels if any.

95.     Defendants breached the Eye Drops' implied warranty because the Eye Drops could not pass without objection in the trade under the contract description; the Eye Drops were not of fair or average quality within the description; the Eye Drops were unfit for their intended and ordinary purpose; and the Eye Drops did not conform to promises and affirmations of fact on the labeling.

23

96.    The Eye Drops were not merchantable and were defective in that they created an unreasonable risk of causing injuries when used as directed and intended by Defendants due to bacterial contamination and that defect existed when Defendants sold the Eye Drops to Plaintiff. Plaintiff did not receive the Eye Drops as impliedly warranted by Defendants.

97.    Defendants' implied warranty breaches caused Plaintiff injury in an amount to be determined at trial. Further, Defendants' actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

98.    Plaintiff was not required to provide Defendants with notice because she suffered physical injuries; based on futility; and/or because Defendants were on notice of their breaches from other sources, including notice from the FDA prior to Plaintiff's Eye Drops purchase and injuries (as alleged above).

99.    There is privity between Plaintiff and CVS regarding the Eye Drops purchase because Plaintiff purchased the Eye Drops directly from CVS. However, privity is not required between Plaintiff and Defendants because Plaintiff was personally injured by the Eye Drops. Moreover, Plaintiff was the known end user of the Eye Drops; the Eye Drops' implied warranties were intended for Plaintiff's immediate benefit, and Plaintiff was the intended third-party beneficiary of the warranties between Defendants and Defendants' direct purchasers.

100.    Defendants' attempts to disclaim or limit the warranties vis-à-vis consumers are unenforceable based on vagueness, inconspicuousness, and unconscionability. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold a defective product without informing consumers about bacterial contamination and/or the substantial risk of bacterial contamination. In addition, a gross disparity in bargaining power existed between Defendants and Plaintiff, as only Defendant knew that the Products contained

24

bacteria at the time of sale and that the Eye Drops were not of merchantable quality.

## JURY DEMAND

101.    Plaintiff demands a trial by jury on all issues.

**WHEREFORE**, Plaintiff demands judgment and the following relief:

(a)    Awarding actual, compensatory, and punitive damages;

(b)    Awarding Plaintiff her costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, experts, and reimbursement of Plaintiff's expenses; and

(c)    Granting such other and further relief as the Court may deem just and proper.

Dated: January 30, 2024

**SQUITIERI & FEARON, LLP**

By: */s/ Stephen J. Fearon, Jr.*
Stephen J. Fearon, Jr.
Paul Sweeny
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: Stephen@sfclasslaw.com
Email: Paul@sfclasslaw.com

**ATTORNEYS FOR PLAINTIFF**